Filed 12/15/25  In re Christopher R. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Christopher R. et al., Persons Coming Under the Juvenile Court Law. | B340784 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>CHRISTIAN R.,<br><br>          Defendant and Appellant. | Los Angeles County Super. Ct. No. 24CCJP01717A–B |

APPEAL from jurisdictional and dispositional findings and orders of the Superior Court of Los Angeles County, Daniel Z. Zeidler, Judge.  Affirmed in part, dismissed in part.

Sean A. Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Appellant Christian R. (Father) appeals the juvenile court's jurisdictional and dispositional findings and order as to minor children Christopher R. (born February 2019) and Sofia R. (born April 2024). Father contends the juvenile court erred in finding that he sexually abused his then–minor half-sister Paris, and that he and Mother engaged in domestic violence, placing Christopher and Sofia at substantial risk of serious harm. Father also argues the juvenile court erred when it ordered the children removed from his care and physical custody. Mother is not a party to this appeal.

The Los Angeles County Department of Children and Family Services (DCFS) contends Father's appeal is moot given post-disposition events. Alternatively, DCFS argues substantial evidence supports the juvenile court's findings and orders.

We affirm the juvenile court's jurisdictional findings and dismiss as moot Father's appeal of the dispositional orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Referrals and Investigation*

On September 20, 2023, DCFS received a referral that Father emotionally abused four-year-old Christopher and Father's 17-year-old half-sister Paris.[1] According to Mother, then three months pregnant with Sofia, events commenced when Father threw a mug with warm coffee at her back on September 17, 2023. Mother has a photograph of a huge coffee stain on her

---

[1] Paris was detained from her own parents in May 2023 and placed in Father's home in June 2023. Paris is the children's paternal aunt.

2

back. According to Father, the coffee accidentally spilled on Mother's back. He said Mother is pregnant and "hormonal." Christopher was asleep in the house during the incident and Paris was there for part of the incident. Mother stated Father has been "physically and emotionally abusive to her" and has "pushed her around and thrown items around." Mother said Christopher was usually not asleep during past domestic violence incidents. Mother packed up her belongings, moved out of Father's home, and moved into maternal grandmother's (MGM) apartment next door.

On November 28, 2023, DCFS received another referral in response to Mother's 1:30 a.m. call to law enforcement. Mother stated she arrived home from work at 1:00 a.m., heard running, turned the lights on, and saw Father's boxers and Paris's underwear and bra on Paris's bed (in the living room). Mother grabbed her phone and recorded for the next 10 minutes. Paris was hiding naked in the closet in Father's bedroom and Father was lying on his bed, asleep with "a shirt on and no pants." Mother slapped Father several times. Paris denied engaging in sexual behavior with Father. She said she was "taking naked pictures for her Snapchat." When Paris heard the door opening, she was startled and ran to the bedroom where Father was sleeping. Father denied having sex with Paris. Law enforcement arrested Mother as the aggressor.

The children's social worker (CSW) interviewed Mother about the incident. Mother said she arrived at Father's home and found Paris "naked inside the bedroom closet" while Father was lying on a bed inside the same bedroom. Mother started screaming and called the police. Paris denied sexual abuse by Father and stated she was "taking naked pictures inside the

3

closet." Mother told the CSW that Christopher spends the nights at Father's home because Mother works nights cleaning offices.

After this incident, Father and Mother broke up.

A few months later, on March 21, 2024, DCFS received a referral alleging Father had sexually abused Paris. The referral alleged that beginning in June 2023 when Paris was placed at Father's home, he began to sexually abuse her. The abuse escalated to sexual intercourse. Paris was "afraid to tell the truth about the abuse then" and did not report Father until March 2024 when her half-sister in Oregon encouraged her to report the abuse. Paris stated the sexual abuse lasted for about six months. As for the November 28, 2023 incident, Paris explained that "once the police left the residence, [Father] began making statements such as 'What am I going to do?' and 'How can I get out of this?'" He "decided to come up with a cover story for what had happened" and "convinced her to tell this story." She stated Father "used guilt to make her not tell anyone as he would lose his kid, go to jail, and ruin his life."

On April 2, 2024, the CSW interviewed Father and completed a home assessment of his one-bedroom home. Father denied sexually abusing Paris and denied having any contact with her since she moved to Oregon in December 2023. As for the November 28, 2023 incident, Father reported he was asleep and heard someone running inside the bedroom and "fully woke up when [M]other started yelling at him." Father told the CSW that Mother has previously slapped or hit him.

On April 3, 2024, Father's drug tests results were positive for marijuana. Father denied smoking when Christopher is in his care.

In late April 2024, Sofia was born.

On April 30, 2024, the CSW interviewed Paris, who confirmed she and Father engaged in sexual acts and intercourse when she was under the age of 18. Paris reported the sexual abuse started in June 2023 when she was placed in Father's home; they "would watch TV or shows on the couch and laying down on the bed. It turned into that." She "closed her eyes" and was falling asleep when he began kissing her face and her "heart sank." He told her he "had gotten a 'hard-on' while watching the movie with her" and "lifted the blanket off of his lap and revealed a bulge in his pants." He then placed his hands between her legs. Paris revealed to the CSW she was a virgin before this. Father purchased a package of three condoms and "they had used them all." Paris told the CSW that "sexual intercourse happened mostly inside of the residence and once inside of the car" and "he would have sex with her anywhere from one time a week up to 3 to 4 times a week."

Paris confirmed the last time they had sex was on November 28, 2023; she and Father were having sex in the living room and upon hearing Mother's entry into the home, Father "ran to the bedroom, and quickly put on his clothes." When Mother entered the bedroom, Father "pretended to be asleep on the bed." Paris reported when she and Father had sex, sometimes Christopher was at the home with them; "there were times [Christopher] was awake and would be playing his video games in another part of the house." Father called Paris "multiple times" after she moved out of his house on December 5, 2023, telling her he wanted her in his life and is in love with her. She confirmed he was also in contact with her by text messages. She previously denied the sexual abuse to law enforcement

5

because she did not want Father to get in trouble but decided to disclose it after her half-sister encouraged her to do so.

B. ***Petition and Detention***

On June 4, 2024, DCFS filed a Welfare and Institutions Code[2] section 300 petition on behalf of Chrisopher and Sophia. It alleged:

- Counts b-1, d-1: Father "sexually abused the children's now adult paternal aunt, [Paris], when the paternal aunt was a minor and resided in the children's home." Father's sexual abuse of Paris took place from June through November 2023 while she was under Father's care and supervision. Paris is now a "non-minor dependent of the court." On numerous occasions in 2023, including November 28, 2023, Father sexually abused Paris "by penetrating [her] vagina with [his] penis, while the child Christopher was in the home." Mother "knew or reasonably should have known of the sexual abuse" and allowed Father to have unlimited access to and reside in the home with Paris and Christopher. "Such sexual abuse of the children's paternal aunt by [Father], and [Mother's] failure and unwillingness to protect . . . endangers the children's physical health and safety and places the children at substantial risk of serious harm, damage, danger, sexual abuse."

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

At the June 18, 2024 detention hearing, minors' counsel, DCFS, and Mother all asked the court to detain the children from Father. At the request of DCFS, Christopher testified in chambers to support the request for detention. When asked if anybody has touched his private parts, he answered, "No." Christopher acknowledged Paris used to live with him. When asked, "What did [Paris and Father] do when they were together?" Christopher answered, "They love" and confirmed they were "in love." When asked, "When your daddy and Paris were together, what did they do together?" Christopher answered, "They doing pow pow (phonetic)." Next, Christopher was asked whether Mother and Father fight, and he stated, "They all fight, and I just cry." Christopher indicated they fight "in the face" and demonstrated by taking "his left hand closed into a ball and hit himself on the forehead."

Following Christopher's testimony, the juvenile court detained the children from Father and released them to Mother's care. Father was permitted monitored visitation.

C. **_Continued Investigations_**

On July 8, 2024, Mother was interviewed by the CSW. Initially Mother stated Christopher was asleep in his toddler bed during the November 28, 2023 incident. Later during the same interview, Mother admitted Christopher "woke up" and that Mother and Father "acted like nothing was happening, and he started playing on his tablet."

Detective Gabriela Guillen of the Los Angeles County Sheriff's Department was assigned to the investigation of Paris's sexual abuse claims against Father. Detective Guillen informed the CSW that Paris had reported to her that she was in a romantic relationship with Father until March 2024.

7

During her July 10, 2024 interview with the CSW, Paris reported Mother and Father would "fight a lot." Paris witnessed Mother hit Father "at least three times." Paris stated Father "will drink at work and at home" and has seen him drink. She recalled an occasion where she left for a Halloween party and found multiple bottles and cans of beer in the home upon returning. Paris also reported that after she left Father's home in December 2023, he "continued to contact her, make her feel guilty, and attempt to resume a relationship." He was "very obsessive" and would both call and text her. "[T]he last contact was over a month ago and 'he told me he still loves me and still wanted to talk to me every day. He asked me to call him every day.'" He tried to call her pet names, which made her uncomfortable. When Paris informed Father of her new boyfriend, he was "upset."

The CSW interviewed Paris's half-sister who reported Paris disclosed the sexual abuse on December 5, 2023. The half-sister was "in shock" when Paris explained Father had "anal sex and oral [sex]" with her first and then "took her virginity." Father had asked Paris to take a Plan B pill; she contracted a sexually transmitted disease for which she took medication.

D.   ***First Amended Petition***

On July 30, 2024, DCFS filed a first amended petition, adding allegations pursuant to section 300, subdivisions (a) and (b)(1), as follows:

<u>Counts a-1, b-2</u>: Father and Mother have a "history of engaging in physical and verbal altercations in the presence of the minor Christopher." On November 28, 2023, Mother "struck" Father several times. On prior occasions, the parents pushed each other and threw objects at each other. Father previously

8

removed Mother from their home and "restricted her" from taking Christopher.  Mother previously "punched [Father] on the chest, struck his face and pulled his hair."  The parents' "violent conduct" endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of serious physical harm.

E.    ***Adjudication***

On September 16, 2024, the juvenile court convened the jurisdictional and dispositional hearing.  After argument, the juvenile court sustained the amended petition—counts b-1, b-2, and d-1 as to Mother and counts a-1, b-1, b-2, and d-1 as to Father.  The court proceeded to disposition, finding return of the children to Father detrimental to their safety, protection, or physical or emotional well-being.  They were ordered released to Mother's home, with monitored visitation by Father.

Father's court-ordered case plan included participation in a batterer's intervention program, sex abuse counseling for perpetrators, six random or on-demand drug/alcohol tests, parenting classes, and individual counseling to address case issues.

Father timely appealed.

F.    ***Post-Disposition Events[3]***

On February 11, 2025, while Father's appeal was pending, the juvenile court terminated the home-of-Mother order and made a home-of-parents order.  On June 6, 2025 the juvenile

---

[3]    We grant DCFS's July 30, 2025 request for judicial notice as to exhibits A and B—the minute orders issued February 11, 2025 and June 6, 2025.  (Evid. Code, § 452, subds. (c), (d).)

9

court found the conditions justifying the initial assumption of jurisdiction ceased to exist and are not likely to reoccur if supervision is withdrawn.  The court terminated jurisdiction over the minor children.

## DISCUSSION

Father argues on appeal that insufficient evidence supports the juvenile court's jurisdictional and dispositional findings, warranting reversal of the court's orders.  DCFS contends Father's appeal is moot given post-disposition events or, in the alternative, that substantial evidence supports the juvenile court's findings and orders.

We address these contentions below.

### A.  *Justiciability/Mootness*

#### 1.  Applicable Law

"A reviewing court must ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276.)  "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)  "A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' " (*In re D.P.*, at p. 276.)  A case becomes moot when events render it impossible for a court, if it should decide the case in favor of plaintiff, to grant him any effective relief. (*Ibid*.)  An important

10

requirement for justiciability is the availability of effective relief. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1489.)

A reviewing court may exercise its inherent discretion to reach the merits of the parent's arguments when "(1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.)

2.    Analysis

In light of the juvenile court's order terminating jurisdiction and releasing the children with a home-of-parents order, DCFS argues this appeal should be dismissed as moot. Father urges us to exercise our discretion to address the merits of his appeal because the jurisdictional findings that his children were at risk of sexual abuse or serious physical harm could be prejudicial to him. Father argues the allegations concern particularly pernicious or stigmatizing conduct as to both the sexual abuse and domestic violence allegations, which may detrimentally impact him in a future family law or dependency court case. Father concedes that the children's subsequent return to his custody has technically mooted his challenge to the removal order, but he requests that we exercise our discretion to reach the merits.

We consider the merits of Father's appeal as to jurisdiction. The children will remain minors for a considerable length of time, as Sofia is one year old and Christopher is six years old; future action as to the children is possible, either in the family law or dependency context, until they reach the age of majority. It is

11

also plausible Mother or the family law court may rely on the juvenile court's findings in making future, modified custody or visitation orders; thus, prejudice in subsequent family law or dependency proceedings is possible, rendering Father's appeal from the jurisdictional findings justiciable.

However, we agree with DCFS that Father's challenge to the juvenile court's dispositional order removing the children from his physical custody/care has been rendered moot by the juvenile court's order returning the children to both parents' care, with a home-of-parents order. Father has received the precise relief he seeks by way of this appeal, and there is no further relief we can provide as to removal. "[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.) We decline to exercise discretion to adjudicate the merits of his appeal of the removal order and dismiss the appeal of that order as moot.

B. ***Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings***

On appeal, Father challenges the juvenile court's jurisdictional findings as to counts a-1, b-1, b-2, and d-1 for lack of substantial evidence. When, as here, several bases of jurisdiction are challenged on appeal, "[t]he reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds." (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.) "[T]he paramount purpose underlying dependency proceedings is the protection of the child." (*Id.* at p. 877.) Where one basis for jurisdiction is supported by substantial evidence, the reviewing court does not need to consider sufficiency of evidence to support other grounds. (See

*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72 (*Randi R.*); see also *In re I.A.*, *supra,* 201 Cal.App.4th at p. 1492 [The minor is a dependent if the actions of a parent bring the minor within one of the statutory definitions of a dependent.].)  "For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*In re I.A.*, at p. 1492.)

We proceed with our review of the juvenile court's jurisdictional findings per section 300, subdivision (b)(1)—i.e., counts b-1 and b-2.  We need not reach the merits of the other counts if we conclude counts b-1 and/or b-2 are supported by substantial evidence.

### 1.    Standard of Review

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we "consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.)  "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)  In making our determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations and we note that issues of fact and credibility are within the province of the trial court.  (*In re I.J.*, at p. 773.)  " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are

13

sufficient facts to support the findings of the trial court." ' "
(*Ibid*.)  We uphold the juvenile court's findings unless they are
" ' "so lacking in evidentiary support as to render them
unreasonable." ' "  (*Jamieson v. City Council of the City of
Carpinteria* (2012) 204 Cal.App.4th 755, 763.)

2.    Applicable Law

Under section 300, subdivision (b)(1), a juvenile court may
assert jurisdiction over a child if "[t]he child has suffered, or there
is a substantial risk that the child will suffer, serious physical
harm or illness as a result of . . . [¶] (A) The failure or inability of
the child's parent . . . to adequately supervise or protect the
child."  (§ 300, subd. (b)(1).)  A jurisdictional finding under section
300, subdivision (b)(1) requires DCFS to demonstrate by a
preponderance of the evidence: (1) neglectful conduct by the
parent in one of the specified forms; (2) causation; and (3) serious
physical harm or illness to the child or a substantial risk of such
harm or illness.  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

3.    Analysis

We find substantial evidence supports the juvenile court's
jurisdictional findings in counts b-1 and b-2—that Father's
sexual abuse of his then-minor half-sister Paris and the parents'
history of domestic violence placed Christopher and Sofia at
substantial risk of harm pursuant to section 300,
subdivision (b)(1).

Within a few weeks of her placement at Father's home
under his care and supervision, he began sexually abusing Paris
and continued to do so for the next six months.  Paris reported to
the CSW that Father had sex with her one to four times a week
and that, oftentimes, Christopher "was awake and would be

14

playing his video games in another part of the house." Christopher testified and confirmed that Father and Paris were "in love" and when asked what Paris and Father did when they were together, Christopher answered, "They doing pow pow (phonetic)." Mother admitted to the CSW during her July 8, 2024 interview that Christopher "woke up" during the November 28, 2023 incident and that Mother and Father "acted like nothing was happening, and he started playing on his tablet." The juvenile court aptly noted at the June 18, 2024 hearing that "case law . . . looks at various factors. Maybe . . . it was occurring in the same room the boy was sleeping in, or it was occurring in the home where the boy might possibly wander in, which here might be an issue" since "Mother walked in, so surely [Christopher] could have walked in." We find the nature and extent of the sexual abuse and the fact that it was conducted in a place "capable of being observed" by other children, placed all the children residing in the home at substantial risk of harm. (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1332.)

Father argues the children would take 12 to 17 years to reach Paris's age when she was sexually abused, and so there was no current risk of harm to Christopher and Sofia. We disagree. In *In re Ricky T.* (2013) 214 Cal.App.4th 515, for instance, Juan T.—maternal grandfather and legal guardian to three-year-old Ricky T.—appealed the jurisdictional and dispositional findings and orders made with respect to Ricky. (*Id.* at p. 517.) Juan T. argued "his sexual abuse of his stepgranddaughters, A.G. and D.G., then ages 12 and nine years, is insufficient to show Ricky T. was at risk of harm in his care." (*Ibid.*) The reviewing court disagreed and concluded that Juan T.'s "conviction of crimes involving sexual abuse of A.G. gave rise

15

to a presumption Ricky T. was at risk of harm in Juan T.'s care." (*Ibid*.) The reviewing court further found "given that Juan T. *boldly abused* A.G. . . . , the juvenile court reasonably could conclude Juan T. might sexually abuse a child in Ricky T.'s presence." (*Ibid.*, italics added.) Overwhelmingly, case law categorically holds that "sexual abuse of one child may constitute substantial evidence of a risk to another child in the household— even to a sibling of a different sex or age or to a half sibling." (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 968.)

As for the parents' domestic violence, Mother stated Father threw a mug with warm coffee at her back on September 17, 2023—when she was three months pregnant. Christopher was in the house during the incident. Mother also stated Father was physically abusive to her, had "pushed her around and had thrown items around." Mother admitted Christopher was usually not asleep during past domestic violence incidents. Mother also slapped Father several times during the November 28, 2023 incident, resulting in her arrest as the aggressor. Paris reported domestic violence in Father's home during her July 10, 2024 interview with the CSW. In addition, Christopher himself testified that Mother and Father "fight, and I just cry." Christopher indicated his parents fight "in the face" and demonstrated by taking "his left hand closed into a ball and hit himself on the forehead." We find this qualifies as substantial evidence supporting the juvenile court's jurisdictional finding that the parents' domestic violence placed the children at substantial risk of harm.

We conclude that the evidence "view[ed] . . . in the light most favorable to the juvenile court's determinations" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992) is sufficient to support the jurisdictional findings in counts b-1 and b-2 as to Father.  We need not consider the sufficiency of the evidence as to the other counts.  (See *Randi R.*, *supra*, 64 Cal.App.4th at p. 72; see also *In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492.)

## DISPOSITION

We affirm the juvenile court's jurisdictional findings and dismiss as moot Father's appeal from the dispositional order.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

VIRAMONTES, J.

RUBIN, J.*

---

\*      Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17